UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
DEBORAH TOWNES,

             Plaintiff,

    -against-

SERVICES FOR THE UNDERSERVED, INC.,

             Defendant.

------------------------------------------------------------------x

**19 Civ. 5597**

**COMPLAINT**

## PRELIMINARY STATEMENT

1.     Plaintiff, Deborah Townes, is a mentally disabled, 58 year old woman suffering from severe bipolar disorder with psychotic features.  Defendant, Services for the Underserved, Inc. (SUS), despite being a provider of supportive housing for the mentally disabled and proclaiming to value the fight against homelessness, refused to provide multiple accommodations to Ms. Townes, placing her in imminent risk of eviction and homelessness.  Specifically, SUS failed to provide Ms. Townes with any mental health care for over four years, ignored her ongoing and multiple requests to be transferred to a single occupancy apartment, commenced an eviction proceeding in Housing Court rather than completing an HRA 2010e application for alternative housing or otherwise assisting her in transferring, and refused to discontinue or stay the Housing Court proceeding.  Instead of providing Ms. Townes with ongoing mental health treatment and granting her request to move into her own apartment, SUS kept Ms. Townes in a harmful living environment and then, when that situation became untenable due to her untreated mental illness, commenced an eviction proceeding against her.

1

2.      As a result of this failure to reasonably accommodate Ms. Townes, she has been deprived of the opportunity to use and enjoy her housing.  She has endured years of suffering and emotional distress under SUS's alleged supportive housing care, exacerbating her mental health condition, and is now facing the immediate threat of eviction. Given the severity of Ms. Townes' mental health disability, she will be particularly vulnerable in the shelter system and is unable to locate or secure housing on her own.  Ms. Townes moved into SUS housing from the shelter system and is living in constant fear of the dire circumstance of being forced to return, expressing her fear of another heart attack or even suicide to her SUS caseworkers.

3.      Defendant's conduct violates the Fair Housing Act, the New York State Human Rights Law and the New York City Human Rights Law.  Plaintiff seeks a declaration that by failing to reasonably accommodate her, SUS is unlawfully discriminating against her on the basis of her disability and depriving her of the opportunity to use and enjoy her housing accommodations.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 for civil actions arising under the laws of the United States; and 28 U.S.C. § 1343 for actions arising under laws providing for the protection of civil rights.  Plaintiff's state law claims are pled pursuant to 28 U.S.C. § 1367 because Plaintiff's federal and state law claims are related and arise out of a common nucleus of related facts.

5.      Plaintiff seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act) and Rule 57 of the Federal Rules of Civil Procedure, and injunctive relief pursuant to 42 U.S.C. § 3613(c) (Fair Housing Act) and Rule 65 of the Federal Rules of Civil Procedure.

6.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) because that is the district in which a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred.

## PARTIES

7.      Plaintiff Deborah Townes is a mentally disabled woman who resides at 639 Eastern Parkway, Apt 2C, Brooklyn, NY 11231.  Ms. Townes has been and continues to be adversely affected by the acts, policies and practices of Defendant and/or its agents.

8.      Defendant Services for the Underserved, Incorporated (SUS) is a not-for-profit corporation duly formed under the laws of the State of New York.  SUS operates housing and provides supportive social services for persons with disabilities and thus its facilities qualify as a covered dwelling under 42 U.S.C. §3604(f)(7)(A) of the Fair Housing Act and a housing accommodation under N.Y. Exec. Law § 292(10) of the New York State Human Rights Law and N.Y.C. Administrative Code § 8-102 of the New York City Human Rights Law.

## STATUTORY AND REGULATORY SCHEME

### The Fair Housing Act

9.      The Fair Housing Act (hereinafter "FHA") prohibits discrimination in the rental of housing in covered multi-family dwellings. 42 U.S.C. §3604 *et seq*.

10.     The FHA makes it unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person.  42. U.S.C. §3604(f)(2)(A).

11.     A handicap under the 42 U.S.C. §3602(h) means:

(1) a physical or mental impairment which substantially limits one or more of such

3

person's major life activities,

(2) a record of having such an impairment, or

(3) being regarded as having such an impairment, but such term does not include current, illegal use of or addiction to a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)).

12.   For purposes of the FHA, discrimination includes a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.  42 U.S.C. §3604(f)(3)(b).

13.   Plaintiff is an aggrieved person as defined in 42 U.S.C. §3602(i), has been injured by Defendant's discriminatory conduct, and has suffered damages as a result.

14.   Defendant's conduct was unlawful, intentional, willful, and undertaken in disregard for the rights of others.

15.   Under the FHA, "if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the Plaintiffs actual and punitive damages, and … may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate)." 42 U.S.C.A. §3613(c)(1). The court may also grant the prevailing party actual and punitive damages reasonable attorney's fees and costs. 42 U.S.C.A. §3613(c)(1) and (2).

## New York State Human Rights Law

16.   The New York State Legislature enacted the Human Rights Law to "eliminate and prevent discrimination in…housing accommodations…."  N.Y. Executive Law § 290(3).

17.     It shall be an unlawful discriminatory practice for the owner, lessee, sub-lessee, assignee, or managing agent of, or other person having the right to sell, rent or lease a housing accommodation, or any agent or employee thereof to discriminate against any person because of . . . disability. . . in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or in the furnishing of facilities or services in connection therewith.  N.Y. Exec. Law § 296(5)(a)(2).

18.     "It shall be an unlawful discriminatory practice for the owner, lessee, sub-lessee, assignee, or managing agent of, or other person having the right of ownership of or possession of or the right to rent or lease housing accommodations: To refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford said person with a disability equal opportunity to use and enjoy a dwelling, including reasonable modification to common use portions of the dwelling." N.Y. Exec. Law § 296(18)(2).

19.     The term "housing accommodation" includes any building, structure, or portion thereof which is used or occupied or is intended, arranged or designed to be used or occupied, as the home, residence or sleeping place of one or more human beings.  N.Y. Exec. Law § 292(10).

20.     The New York State Human Rights Law defines "disability" as "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques…."  N.Y. Exec. Law § 292(21)

<u>**New York City Human Rights Law**</u>

21.     The New York City Human Rights Law makes it "an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of a public accommodation because of the actual or perceived . . .

5

disability . . . directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . ." N.Y.C. Administrative Code § 8-107(4).

22.     The term "housing accommodation" includes any building, structure or portion thereof that is used or occupied or is intended, arranged or designed to be used or occupied, as the home, residence or sleeping place of one or more human beings. Except as otherwise specifically provided, such term includes a publicly-assisted housing accommodation.  N.Y.C. Administrative Code § 8-102.

23.     The City Human Rights Law also makes it an unlawful discriminatory practice "to discriminate against any person because of such person's actual or perceived . . . disability . . . in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or an interest therein or in the furnishing of facilities or services in connection therewith. N.Y.C. Administrative Code § 8-107(5).

24.     It is a "[r]equirement to make reasonable accommodation to the needs of persons with disabilities. Except as provided in paragraph (b), any person prohibited by the provisions of this section from discriminating on the basis of disability shall make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job or enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." N.Y.C. Administrative Code § 8-107 (15)(a).

25.     The New York City Human Rights Law defines "disability" as "any physical, medical, mental, or psychological impairment." N.Y.C. Administrative Code § 8-102.

### New York City Supportive Housing

26.     New York City defines supportive housing as follows:

6

Supportive housing is a combination of affordable housing and support services designed to help individuals and families use housing as a platform for health and recovery following a period of homelessness, hospitalization or incarceration or for youth aging out of foster care.  Supportive housing is affordable, permanent and independent housing that meets the needs of tenants by providing support and that is integrated within a neighborhood and community.  The two primary types of supportive housing are:

> Single-site (also referred to as congregate): A designated building where each individual or family has a private living quarters and may share kitchens and/or common recreational rooms or other facilities.

> Scattered-site: units in apartment buildings spread throughout a neighborhood or community that are designated for specific populations, accompanied by supportive services.[1]

27.     All prospective supportive housing tenants must work with a pre-approved social service or health provider to complete and submit an HRA 2010e application.  According to the Human Resources Administration, once an application is submitted, a clinical team from HRA's Customized Assistance Services reviews the application and makes an eligibility determination based on requirements for the different initiatives. Formal documentation of this determination is returned to the provider who originally submitted the application.[2]

### Agency Contracts

28.     SUS is contracted with the NYC Department of Department of Health and Mental Hygiene (DOHMH) and the NYS Office of Mental Health (OMH) to provide services and supportive housing at the subject premises.  The term of the DOHMH contract is July 1, 2018 through June 30, 2027.   The term of the OMH contract is July 1, 2018 through June 30, 2019.

---

1 https://www1.nyc.gov/site/doh/health/health-topics/housing-services-supportive-housing.page  (last visited September 29, 2019)

2 https://www1.nyc.gov/site/hra/help/accessing-supportive-housing.page
(last visited September 29, 2019)

These contracts were acquired by Plaintiff's attorney by court ordered subpoenas in the Housing Court proceeding.

29.     The DOHMH contract outlines the target population for the subject premises, the staffing numbers, and the supportive services that must be provided.  The contract lays out the scope of services that SUS must provide and includes extensive requirements regarding those supportive services including a comprehensive needs assessment of each tenant upon the tenant's entry into the program, an individualized housing and services plan for each tenant, and objectives and outcomes for their plans.

30.     Under the individualized housing and services plan, SUS is required to directly provide education, vocational and employment support, budgeting and financial support, and health and mental health services.

31.     Further, the DOHMH contract directly states, "Supportive Housing is Permanent Housing.  Once obtained, efforts will be made by provider to assist the individual in maintaining the residence…."

32.     The contract also outlines housing requirements including apartment configurations, community space, rental agreements which include rent setting guidelines, and the termination of tenancies.  In regard to termination of tenancy the contract states:

> Provider will only seek termination of a tenant's tenancy as a last resort and after ample opportunity for corrective action with substantial direction and support from staff.  Due process procedures and New York landlord/tenant law must be followed.  Provider will assist in identifying alternate appropriate placement for tenant who lose their housing.  Provider will make all diligent efforts to prevent eviction, by case conferencing, written notifications, and payment arrangements or any other means to prevent eviction and to use Housing Court only as a last resort.

33.     The OMH contract outlines the program goals and outcomes for the scattered site

8

housing program and states that within the fiscal year of the contract, "95% of tenants will remain in stable housing." Further, the contract requires that 100% of tenants will be connected to income services, will complete a vocational assessment, and will receive referrals to medical and behavior health providers.

## STATEMENT OF FACTS

### Defendant SUS

34.     Defendant Services for the Underserved, Inc. (SUS) is a not-for-profit corporation formed under the laws of the state of New York.  SUS claims to offer housing, employment, treatment services, and rehabilitation services to over 35,000 New York City residents.  Their housing services include both low income and supportive housing.  According to their website, SUS provides transitional and permanent housing in single site residences, apartment buildings and scattered site apartments for adults in recovery from mental illness, adults with substance use challenges, and adults living with HIV/AIDS.  SUS, "envisions a city where everyone has a roof over their head, is healthy, productive and can enjoy the social connections that create a life of purpose."[3]

35.     A review of SUS records reveals, however, that SUS refused to accommodate Ms. Townes in violation of the FHA or to comply with their contractual obligations with DOHMH and OMH in several significant ways.

36.     SUS is on notice of every resident's mental health disability upon their admittance into SUS facilities. Despite their awareness of Ms. Townes' bipolar disorder, SUS failed to ensure that Ms. Townes received mental health services for over four years, during which time Ms. Townes went without any psychiatric care, medication or mental health therapy.

_____

3 https://sus.org/ (last visited September 20, 2019)

9

37.     Second, because of her bipolar disorder, Ms. Townes struggles living in a group environment.  Ms. Townes repeatedly asked to be transferred from her shared living situation with multiple roommates to a single occupancy apartment. SUS ignored the request, allowing the situation between Ms. Townes and her roommates to continually escalate.

38.     Third, rather than completing her HRA 2010(e) Supportive Housing Application and identifying appropriate alternate housing, SUS commenced an eviction proceeding against Ms. Townes.

39.     Finally, even after Ms. Townes' retained counsel in her eviction proceeding and counsel made multiple requests, SUS refused to discontinue or stay the Housing Court proceeding to allow Ms. Townes adequate time to find alternate housing, placing Ms. Townes in imminent danger of eviction and homelessness.

40.     Unfortunately, Ms. Townes is not the only SUS resident in these dire circumstances. As of the date of this complaint, there are 220 active Housing Court index numbers in Brooklyn, Manhattan, and the Bronx.

**Plaintiff, Deborah Townes**

41.     Deborah Townes resides at 639 Eastern Parkway, 2C, Brooklyn, NY 11231.  Her apartment is part of the SUS scattered site supportive housing program serving people with mental health issues. Ms. Townes is 58 years old and suffers from severe bipolar disorder with psychotic features.  She also suffers from various physical ailments, including diabetes and hypertension, and recovered from cardiac arrest in February 2012.  Further, she is in long term recovery from substance use. Her only income is Supplemental Security Income (SSI).

42.     Ms. Townes entered into the SUS housing program on July 27, 2012.  She was transferred from the homeless shelter to an SUS scattered site apartment.  She lived in that

apartment until about December 2014 when she was transferred to her current residence at 639 Eastern Parkway.

43.     639 Eastern Parkway is a privately owned building.  Defendant, SUS, has a lease agreement with the owner of the building for Ms. Townes' unit, 2C.  SUS subleased the unit to Ms. Townes on December 31, 2014, as part of their scattered site housing program funded through a contract with the New York State Office of Mental Health (OMH) and Department of Health and Mental Hygiene (DOHMH).

44.     Pursuant to her sublease agreement, Ms. Townes is responsible for paying $251.10 each month from her SSI as her portion of the total rent of approximately $1,900.  Upon her entrance into the program, Ms. Townes was assigned a service coordinator from the SUS mobile team for scattered site housing and has received various levels of case management services from SUS.

45.     According to the Nation Institute of Mental Health:

> Bipolar disorder, also known as manic-depressive illness, is a brain disorder that causes unusual shifts in mood, energy, activity levels, and the ability to carry out day-to-day tasks. People with bipolar disorder experience periods of unusually intense emotion, changes in sleep patterns and activity levels, and unusual behaviors. These distinct periods are called "mood episodes." Mood episodes are drastically different from the moods and behaviors that are typical for the person. Extreme changes in energy, activity, and sleep go along with mood episodes.[4]

46.     As the mental health housing provider that accepted Ms. Townes' initial HRA 2010(e) Supportive Housing Application from the shelter, SUS is on notice of Ms. Townes' mental health diagnosis and the difficulties that this disorder could create for someone trying to reside with roommates.  However, when she entered into the SUS program she was placed in a three bedroom apartment with two other roommates.

---

4 https://www.nimh.nih.gov/health/topics/bipolar-disorder/index.shtml (last visited September 29, 2019)

47.     Since moving into the SUS scattered site program, Ms. Townes has struggled cohabitating with roommates also suffering from various mental health issues.  Ms. Townes had an altercation with one of her roommates at her former SUS residence on or about December 2014.  Her former roommate obtained an order of protection against Ms. Townes and SUS transferred Ms. Townes to her current residence.

48.     Her current residence is also a three bedroom apartment.  Ms. Townes has had three different roommates since moving into the subject premises in December 2014.

49.     Ms. Townes admits to having several verbal altercations with her various roommates over the years, all of whom, upon information and belief, have been diagnosed with mental illnesses.  The altercations have included several arguments and threats between Ms. Townes and her roommates.  Unfortunately, during one altercation in September 2017, Ms. Townes and a roommate became physical and the police were contacted.  Both Ms. Townes and her roommate were arrested and Ms. Townes had to be treated at the hospital for a minor stab wound.  Both Ms. Townes and her roommate obtained orders of protection against one another.  Both Ms. Townes and her roommate stayed with friends and family until the orders of protection were dismissed. SUS then placed them both back into their shared apartment.

50.     Ms. Townes maintains that her SUS service coordinator told her if she didn't deal with her roommate that she would be removed from the program.  She maintains that her roommate physically attacked her on a subsequent evening, but she was too scared to get the police involved for fear of being removed from the program.

51.     Ms. Townes consistently and repeatedly requested that SUS remove her from an environment that exacerbated her mental health condition and prevented her from using and enjoying her housing. These requests for reasonable accommodation are well documented.

52.      Since entering into the SUS scattered site program Ms. Townes repeatedly requested to "move into her own place." At countless face to face interviews and during every single service plan review, Ms. Townes asked if she could transfer to her own apartment. In her January 28, 2016, face to face interview Ms. Townes stated, "I pay my rent, so why can't you just move me into my own place?" In her February 11, 2016 face to face interview, "I really need you [SUS service coordinator] to get me my own place." When her SUS service coordinator inquired about her mental health on March 31, 2016 during an interview, Ms. Townes replied, "everything is good, but I'm so tired of being here with these people. I need my own place; can you please just help me relocate?" On May 9, 2016, when her SUS service coordinator explained to Ms. Townes she would be leaving SUS to take another position, Ms. Townes replied, "how are you leaving me before I get an apartment on my own?" On October 19, 2016, when her SUS service coordinator asked Ms. Townes if she was current on her rent, Ms. Townes explained that she was not paying rent because she wanted to move. On a May 3, 2017, visit from a SUS service coordinator, the service coordinator inquired as to how Ms. Townes deals with her stress and noted, "she continues cooking and thinks about leaving her shared apartment one day."

53.      In each of the service plan reviews dated February 25, 2016, June 25, 2017, September 25, 2017, December 25, 2017, March 25, 2018 and June 25, 2018, the "criteria for discharge" states, "Ms. Townes would like to move to her own apartment and get out of shared housing."

54.      Upon information and belief, according to the OMH contract, SUS has access to single room occupancy dwellings. SUS could have accommodated Ms. Townes by transferring her to a single room occupancy apartment within their own program, yet continually refused.

55.      Aside from the obvious triggers and stress the roommate situation was creating for Ms. Townes, SUS was also aware that Ms. Townes had no mental health therapy or treatment for

13

over four years, a primary goal and a contractual requirement of mental health supportive

housing.

56.      In a face to face interview note dated March 31, 2016, an SUS service coordinator noted,

"Ms. Townes for the past two years ha[s] not met with a therapist and or/psychiatrist…."

Multiple face to face interview notes from 2016 through 2018, confirm that Ms. Townes

subsequently received no mental health services from SUS throughout 2016 into 2018.  SUS

service coordinators did set up multiple appointments with the SUS Wellness clinic, where Ms.

Townes could meet with a psychiatrist and therapist. However, when Ms. Townes missed her

intake appointments, her intake case with the SUS Wellness clinic repeatedly closed and Ms.

Townes continued to go without any mental health services. While the SUS service coordinators

repeatedly noted that Ms. Townes failed to attend in her mental health intake appointments, they

took no further action to assist her with keeping her appointments or accessing care, despite their

awareness of the limitations caused by Ms. Townes's bipolar disorder and their obligation to

provide mental health treatment.

57.      It was not until May 12, 2018, that the SUS service coordinator notes in the face to face

interview notes that Ms. Townes was seeing SUS therapeutic providers. While living in a

housing program intended to meet the needs of people with mental illness, she had not received

treatment for at least four years.

58.      Once she was finally in treatment, the SUS mental health providers immediately

confirmed the toll that the shared living environment was taking on Ms. Townes.   In face to face

interview notes dated June 6, 2018, the service coordinator states that Ms. Townes' SUS

therapist, "expressed concerns regarding Ms. Townes' mental status due to the issues she is

experiencing with her roommates."

14

**Relevant Housing Court Facts and Procedural History**

59.     On or around May 1, 2015, June 3, 2016, October 5, 2016, and December 18, 2017, Ms. Townes received letters from SUS notifying her of alleged violations of her sublease agreement, including being verbally and physically threatening with her roommates and allowing her son to reside in the apartment without the permission of SUS. The letters each warn that if the behavior does not stop that SUS will commence an eviction proceeding against Ms. Townes.

60.     On or around March 28, 2018, Ms. Townes received a Notice of Termination from SUS, notifying her that SUS was electing to terminate her month to month tenancy. The Notice alleges that Ms. Townes's lease expired December 31, 2015. The Notice states that Ms. Townes should leave the premises by May 31, 2018, or that SUS will commence an eviction proceeding. The Notice does not allege any breach of lease or nuisance behavior. The Notice does not reference any of the previous letters regarding an alleged breach of her sublease.

61.     Receiving the court papers created severe stress and anxiety for Ms. Townes. She began to feel unsafe in her home and feared that she could be evicted any day, and the symptoms of her mental health condition worsened.

62.     Ms. Townes relayed her concerns and fears to SUS. During the periodic visits and interviews with her SUS service coordinators, Ms. Townes cried and explained that she didn't know what she would do if she was evicted. She referenced committing suicide or having another heart attack.

63.     SUS was aware that Ms. Townes has nowhere else to live and is incapable of finding housing on her own. The DOHMH contract requires SUS to assist a resident in identifying alternate housing before an eviction proceeding is commenced and mandates that Housing Court is only to be used as a last resort. Nonetheless, SUS did not complete a new HRA 2010e

15

application for Ms. Townes to transfer to another program, assist her in locating any alternate housing, or provide any other support in finding a new home. Instead, in violation of both the FHA and their contractual obligations with DOHMH, SUS commenced an eviction proceeding against Ms. Townes.

64.     On or around June 18, 2018, Ms. Townes received a Notice of Petition and Petition pursuant to the 30 Day Notice of Termination commencing a summary eviction proceeding for a holdover in Brooklyn Housing Court. She subsequently retained Brooklyn Legal Services as counsel and counsel for Ms. Townes appeared for the first time in Housing Court on August 9, 2018.

65.     When Counsel first met with Ms. Townes, the emotional, physical, and mental stress caused by the Housing Court proceeding was clearly having a serious impact on Ms. Townes. She was afraid that her doors could be locked at any time.  She made several references to her prior heart attack and her fear that she was going to have another one.  The uncertainty of her housing placement took a toll on her mental health and exacerbated the symptoms of her mental illness. The SUS service coordinators made no reassurances to Ms. Townes that they would help her find a new apartment before her eviction, causing Ms. Townes' emotional, physical and mental health to deteriorate further.

66.     The Housing Court proceeding, was adjourned multiple times for Ms. Townes's Counsel to subpoena and obtain the various government contracts associated with the subject premises.

67.     After extended motion practice, including a motion to dismiss the proceeding based on SUS's failure to plead the correct regulatory status of the subject premises, the parties were scheduled to appear for settlement or trial on April 15, 2019. The proceeding subsequently was marked off calendar pending the completion of discovery, which has since been completed. The

proceeding is adjourned to October 3, 2019, for trial.

68.     The eviction proceeding has been pending for over 18 months.  It has been an ongoing source of stress and fear for Ms. Townes, exacerbating her mental health symptoms.  Ms. Townes is extremely nervous attending Housing Court appearances and is even more anxious preparing for an impending trial.  Ms. Townes is now in impending danger of eviction pending the completion of the trial.

69.     Had SUS reasonably accommodated Ms. Townes, they could have avoided the need for any Housing Court action.  Instead, SUS failed to provide Ms. Townes with supportive mental health treatment to properly ameliorate her bipolar disorder.  SUS failed to grant Ms. Townes's multiple and continual requests to be housed without roommates.  If problems were not resolved by these two very basic reasonable accommodations, SUS should have completed Ms. Townes's HRA 2010e application to transfer her to another facility or program. Instead, SUS failed to provide any of these accommodations and brought an eviction proceeding against Ms. Townes, placing her in danger of eviction and homelessness and intensifying her mental health symptoms.

70.     According to the disclosure provided in the Housing Court proceeding, SUS finally completed the HRA 2010(e) for Ms. Townes well over a year after the commencement of the Housing Court proceeding.   She was conditionally approved for community care and level II supportive housing.  Level II supportive housing is a higher level of care than the scattered site housing where Ms. Townes currently resides.  SUS notes that Ms. Townes is in need of ongoing psychiatric treatment and daily monitoring of medication management, despite their own failure to provide this care to Ms. Townes for many years.

71.     On July 16, 2019, Counsel for Plaintiff sent a reasonable accommodation request letter to counsel for SUS, requesting that the Housing Court eviction proceeding against Ms. Townes be

17

discontinued.  To date, Plaintiff's counsel has received no response.  Further, Plaintiff's Counsel

has repeatedly asked Counsel for SUS in Housing Court if there are options for settlement. To

date, SUS has only offered a judgment of possession and time to vacate, placing Ms. Townes in

imminent danger of eviction before she can safely transfer to a new supportive housing

residence. SUS has made no alternative settlement offers despite the fact that SUS is finally

working with Ms. Townes to obtain such a transfer.

72.     Ms. Townes is currently working with her SUS care coordinator to secure interviews with

other supportive housing providers.  However, upon information and belief, these interviews and

the process to find alternate supportive housing take an extensive amount of time.  If SUS would

simply discontinue or even stay the pending eviction proceeding, it would give Ms. Townes the

necessary time to be placed with another supportive housing program and safely move.

73.     If SUS continues to refuse to provide this reasonable accommodation in violation of the

FHA and their contractual obligations, Ms. Townes will be forced to participate in a trial as early

as October 3, 2019, which will cause further stress and mental and emotional harm to Ms.

Townes.

74.     SUS revealed in their own disclosure that the impetus for the eviction proceeding is due

to Ms. Townes' conduct, placing her mental health symptoms at the center of their efforts to

discharge her from their program.  Bringing this holdover simply based on the expiration of the

sublease has been revealed to be pretextual. In addition, it is significantly easier to prevail on this

cause of action. SUS will certainly win at trial and be awarded a judgment of possession,

resulting in Ms. Townes's being evicted and becoming homeless once again.

75.     SUS violated the FHA in several important ways that have led to Ms. Townes' current

risk of homelessness.  SUS ignored Ms. Townes' requests to be transferred to an apartment of

her own and failed to provide her with any mental health support for over four years, allowing the situation between Ms. Townes and her roommates to escalate. SUS was certainly on notice of these requests and the need for a reasonable accommodation. As her service care provider, SUS also was on notice of Ms. Townes's bipolar disorder and how that disorder may adversely affect her ability to live with others. Further, Ms. Townes made the request to live by herself countless times during interviews and her service plan reviews. As soon as she finally started receiving mental health therapy from SUS, the SUS health care providers confirmed that the situation with her roommates needed remediation. However, instead of identifying alternate housing within their own program or completing the HRA 2010e application and transferring Ms. Townes to another provider, SUS chose to commence a holdover proceeding in Housing Court.

76.    SUS continues to flout the FHA by refusing to stay or discontinue the Housing Court proceeding until she can be safely placed into another program. Instead, SUS continues to aggressively litigate this eviction proceeding, placing Ms. Townes at impending risk of eviction and homelessness.

## CLAIMS FOR RELIEF

### First Claim: Disability Discrimination Under the Fair Housing Act

77.    Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if fully set forth herein.

78.    Defendant, SUS, failed to ensure that Plaintiff receive any mental health care, including psychiatric or therapeutic services or any medications, for over four years. Defendant refused to grant Plaintiff's request to be transferred to a single occupancy residence. Defendant failed to complete the HRA 2010e application or identify alternative housing before commencing an eviction proceeding in Housing Court. Finally, Defendant refuses to discontinue or permanently

stay the eviction proceeding currently pending against Plaintiff, placing Plaintiff in imminent

danger of eviction and homelessness. Defendant's failure to provide a reasonable modification of

its practices and procedures to afford Plaintiff the opportunity to use and enjoy her dwelling

constitutes discrimination against Plaintiff in the terms, conditions or privileges of sale or rental

of a dwelling, or in the provision of services or facilities in connection therewith because of a

handicap of that person. 42 U.S.C. §§ 3604(f)(2)(A); §3604(f)(3)(b).  Plaintiff is an aggrieved

person as defined in 42 U.S.C. § 3602(i), has been injured by Defendant's unlawful, intentional,

and willful discriminatory conduct, and has suffered damages as a result.

79.      Accordingly, pursuant to 42 U.S.C. §§ 3613 (a) and (c), Plaintiff is entitled to actual

damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**Second Claim: New York State Human Rights Law**

80.      Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if fully set

forth herein.

81.      Defendant's conduct as set forth above constitutes discrimination because of disability in

the terms, conditions, or privileges of the rental of a housing accommodation or in the furnishing

of facilities or services in connection therewith, in violation of the New York Executive Law §

296(5)(a)(2) and N.Y. Exec. Law § 296(18)(2).

82.      Plaintiff has been injured by Defendant's discriminatory conduct and has suffered

damages as a result.

83.      Defendant's conduct was intentional, willful, and undertaken in disregard for the rights of

others.

20

84.     Accordingly, pursuant to Article 15 of the New York Executive Law § 297, Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and attorneys' fees and costs.

### Third Claim: New York City Human Rights Law

85.     Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if fully set forth herein.

86.     Defendant's conduct as set forth above constitutes a refusal to rent or lease or other withholding of a housing accommodation because of disability, in violation of New York City Administrative Code § 8-107(5)(a)(l), and a refusal or withholding of the advantages, facilities or privileges of a public accommodation on the basis of disability, in violation of the New York City Administrative Code § 8-107(4)(a), and a refusal to provide a reasonable accommodation in violation of New York City Administrative Code § 8-107 (15)(a).  Defendant's conduct as set forth above constitutes discrimination because of Plaintiff's disabilities with respect to the terms, conditions, or privileges of the rental or lease of a housing accommodation, in violation of New York City Administrative Code §8-107(5)(a).

87.     Plaintiff has been injured by Defendant's discriminatory conduct and has suffered damages as a result.

88.     Defendant's conduct was intentional, willful, and undertaken in disregard for the rights of others.

89.     Accordingly, pursuant to New York City Administrative Code §§ 8-502(a) and 8-502(f), Plaintiff is entitled to actual damages, punitive damages, injunctive relief and such other remedies as may be appropriate, and attorneys' fees and costs.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff requests that this Court issue an order and judgment as follows:

90.     Declaring that Defendant's failure to reasonably accommodate Plaintiff's disabilities violates:

      (a)    The Fair Housing Act 42 U.S.C. § 3604 *et seq*;

      (b)    The New York State Human Rights Law;

      (c)    The New York City Human Rights Law;

91.     Issuing a permanent injunction prohibiting Defendant from discriminating against Plaintiff on the basis of her disability, including:

    a.  Requiring Defendant to provide ongoing mental health treatment, including psychiatric and therapeutic services and medications, as necessary, to all of their mental health supportive housing residents;

    b.  Requiring Defendant to complete an HRA 2010e application and to identify appropriate alternate housing *before* the commencement of any holdover proceeding in Housing Court;

    c.  Requiring Defendant to continue to assist Plaintiff in locating and interviewing for alternate supportive housing until she is appropriately transferred;

    d.  Requiring Defendant to discontinue the Housing Court proceeding, litigated under the caption *Services for the Underserved v. Deborah Townes,* L&T Index Number 71723/18; or, in the alternative, permanently stay the proceeding until Plaintiff can be appropriately transferred to an alternate supportive housing facility.

92.     Awarding Plaintiff damages for the injuries and expenses incurred as a result of the

preceding violations;

93.     Awarding attorneys' fees and court costs pursuant to 42 U.S.C. § 12205; 42 U.S.C. §

3613(c); and the New York State and New York City Human Rights Laws;

94.     Granting such further and other relief as this Court deems just and proper.

Dated: Brooklyn, New York
        October 2, 2019

                            Respectfully submitted,

                            KRISTEN DRUMM – KD0267
                            Brooklyn Legal Services
                            105 Court Street, 4th Floor
                            Brooklyn, New York 11201
                            (718) 233-6391
                            Attorney for Plaintiff

                            BY:  _____
                                 KRISTEN DRUMM